WR-78,439-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/15/2015 5:09:45 PM
Accepted 5/19/2015 2:48:10 PM
ABEL ACOSTA
CLERK

**WR-78,439-02**


IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

———————————————

**EX PARTE DAMON WEST,**
Applicant

———————————————

*On Application for a Writ of Habeas Corpus*
*in the Criminal District Court No. 7 of Dallas County, Texas*
*Cause No. F09-00248-Y*

FILED IN
COURT OF CRIMINAL APPEALS

May 19, 2015

ABEL ACOSTA, CLERK

———————————————

**STATE'S BRIEF**

———————————————

*Counsel of Record:*

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *Fax*
joconnor@dallascounty.org

*Attorneys for the State of Texas*

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ................................................................................. 3

STATEMENT OF THE CASE ............................................................................. 5

SUMMARY OF ARGUMENT ............................................................................ 8

ARGUMENT ..................................................................................................... 8

     DEFICIENCY PRONG ................................................................................. 11

     PREJUDICE PRONG ................................................................................... 19

PRAYER ........................................................................................................... 24

CERTIFICATE OF COMPLIANCE ................................................................. 24

CERTIFICATE OF SERVICE .......................................................................... 25

# INDEX OF AUTHORITIES

**Cases**

*Baber v. State*,
931 S.W.2d 359 (Tex. App.—Amarillo 1996, pet. ref'd) ............................ 15

*Burnett v. State*,
642 S.W.2d 765 (Tex. Crim. App. 1982) ..................................................... 12

*Ex parte Jimenez*,
364 S.W.3d 866 (Tex. Crim. App. 2012) ....................................................9, 10

*Ex parte Miller*,
330 S.W.3d 610 (Tex. Crim. App. 2009) .............................................9, 15, 19

*Frangias v. State*,
392 S.W.3d 642 (Tex. Cim. App. 2013) ....................................................9, 15

*Huerta v. State*,
359 S.W.3d 887 (Tex. App.—Houston [14th Dist.] 2012, no pet.) .............. 15

*Jackson v. State*,
766 S.W.2d 504 (Tex. Crim. App. 1985) ..................................................... 12

*King v. State*,
649 S.W.2d 42 (Tex. Crim. App. 1983) ....................................................... 16

*Miller v. Lynaugh*,
810 F.2d 1403 (5th Cir. 1987) .................................................................... 19

*Strickland v. Washington*,
466 U.S. 668 (1984) .............................................................................9, 16, 20

*Thomas v. State*,
886 S.W.2d 388 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) .............. 15

*Turner v. State*,
932 S.W.2d 622  (Tex. App.—Houston [14th Dist.] 1996, no pet.) .............. 14

*Varughese v. State*,
892 S.W.2d 186 (Tex. App.—Fort Worth 1994, pet. ref'd) ......................... 15

*Weisinger v. State*,
 775 S.W.2d 424 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd) ........... 19

*West v. State*,
 No. 05-09-00577-CR, 2011 Tex. App. LEXIS 1649 (Tex. App.—Dallas Mar. 8,
 2011, pet. ref'd) (not designated for publication) ....................................... 5

*Wilkerson v. State*,
 726 S.W.2d 542 (Tex. Crim. App. 1986)....................................................... 16

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

The State of Texas respectfully submits this brief as directed by this Court's order dated March 18, 2015.

## STATEMENT OF THE CASE

Applicant was charged with engaging in organized criminal activity by establishing, maintaining, and participating in a combination and the profits of a combination which committed burglary of a habitation. *See* Tex. Penal Code Ann. § 71.02(a) (West Supp. 2010). On May 18, 2009, a jury found applicant guilty as charged and sentenced him to sixty-five years' imprisonment. Applicant's judgment and sentence were affirmed on direct appeal by the Fifth District Court of Appeals. *See West v. State*, No. 05-09-00577-CR, 2011 Tex. App. LEXIS 1649 (Tex. App.—Dallas Mar. 8, 2011, pet. ref'd) (not designated for publication).

Applicant filed an initial application for writ of habeas corpus on July 19, 2012. The trial judge, the Honorable Michael Snipes, entered an Order Designating Issues on August 8, 2012, and appointed writ master April Smith to assist the court in resolving the designated issues. Smith obtained an affidavit from lead trial counsel, Edwin Sigel, in response to applicant's claims of ineffective

assistance of counsel. (AWE 1).[1] On September 11, 2012, Judge Snipes signed the findings of fact and conclusions of law prepared by writ master Smith recommending that relief be denied. The writ record was received by this Court on September 24, 2012. Prior to disposition by this Court, applicant filed a motion to dismiss. This Court granted the motion and applicant's initial habeas application was dismissed on April 3, 2013.

Subsequently, applicant retained Chip Lewis as writ counsel. Lewis filed the instant habeas application on March 19, 2013, alleging that applicant was denied the effective assistance of trial counsel. Judge Snipes entered an Order Designating Issues on April 15, 2013, and again appointed writ master April Smith to assist the court in resolving the designated issues. A live evidentiary hearing was held on September 9, 2013, and testimony was presented from trial counsel Edwin Sigel and Karen Lambert. At the conclusion of the hearing, writ master Smith indicated to the parties that she intended to recommend the granting of relief but was not sure if Judge Snipes would agree with her recommendation. Following the preparation of the hearing transcript, both parties filed proposed findings of fact and conclusions of law for the trial court to consider. On March

_____

[1] This affidavit is attached as an exhibit to the instant habeas application. The State will refer to applicant's writ exhibits as "AWE _."

6

26, 2013, Judge Snipes signed the State's proposed findings recommending that relief be denied.

On April 23, 2014, applicant filed a Motion for Recusal of Trial Court Judge, alleging that Judge Snipes was biased against him and signed the State's proposed findings prior to reviewing the writ hearing record or proposed findings from writ master Smith.[2] On May 12, 2014, after the writ application had already been forwarded to this Court, Judge Snipes voluntarily recused himself from the case. On June 11, 2014, this Court remanded the application to allow the Presiding Judge of the First Administrative Judicial Region to assign the case to another judge. Subsequently, the Honorable Jeanine Howard of Criminal District Court No. 6 was assigned to preside over the case. On July 14, 2014, Judge Howard signed writ master Smith's proposed findings of fact and conclusions of law recommending that relief be granted.

On March 18, 2015, this Court ordered that the instant application be filed and set for submission and that the parties brief the following issues: (1) whether

---

[2] On April 23, 2014, applicant also filed a Petition for a Writ of Mandamus against writ master Smith asking this Court to order her to transmit to the trial court all papers relating to applicant's writ, including "findings, conclusions, orders, recommendations, or other actions." Applicant's motion for leave to file the petition was denied without written order on June 18, 2014.

counsel rendered ineffective assistance of counsel, and (2) if so, whether there is a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable penalty-phase verdict.

## SUMMARY OF ARGUMENT

Looking at the totality of counsel's representation, applicant has failed to demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms so as to render him ineffective. Furthermore, applicant has not shown that, but for counsel's alleged errors, the sentencing jury would have reached a more favorable verdict. As such, he has failed to prove by a preponderance of the evidence that he was denied the effective assistance of counsel.

## ARGUMENT

In the instant habeas application, applicant alleges six grounds of ineffective assistance of trial counsel. *See Writ Application at 6-6e*. Although applicant alleges deficiencies in both the guilt-innocence and punishment stages of trial, he frames his claim as ineffective assistance of counsel at the punishment stage of trial, and he requests relief in the form of a new punishment hearing.

8

A defendant has a Sixth Amendment right to effective assistance of counsel. U.S. Const. amend. VI. An applicant asserting a claim of ineffective assistance of counsel has the burden to prove, by a preponderance of the evidence, that (1) counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

An accused is not entitled to representation that is wholly errorless. *Frangias v. State*, 392 S.W.3d 642, 653 (Tex. Cim. App. 2013). Reviewing courts indulge a strong presumption that counsel's conduct fell within the wide range of reasonable assistance, and that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel. *Ex parte Miller*, 330 S.W.3d 610, 616 (Tex. Crim. App. 2009).The *Strickland* test is judged by the totality of the representation, not

9

by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight. *Jimenez*, 364 S.W.3d at 883.

**THE DEFENSE TEAM**

Applicant was represented at trial by lead counsel Edwin Sigel and co-counsel Karen Lambert. Sigel was the first attorney retained by applicant's family shortly after applicant's arrest. (WRR: 6, 76).[3] Sigel has been licensed to practice law in the State of Texas since 1959. (WRR: 74). Sigel started his career in criminal law and worked for the United States Department of Justice, for a former Assistant United States Attorney, and as a federal defense attorney. (WRR: 74-75). He worked in the banking and securities industry for some time, but then returned to criminal defense work and has been practicing primarily criminal law since that time. (WRR: 74-76). He has handled a wide variety of cases and had hundreds of jury trials during his career. (WRR: 74-76).

After Sigel spoke with the prosecutor and saw the large amount of evidence involved in the case, he requested and obtained a court-appointed investigator, Cliff Jenkins, to assist him in reviewing discovery, investigating, and preparing

---

[3] The State will refer to the reporter's record from the writ hearing as "WRR" and the reporter's record from the trial as "RR_."

applicant's case for trial. (WRR: 82-83). Jenkins was an experienced investigator and did not need much direction from Sigel on how to perform his role on the defense team. (WRR: 83). He spent many hours examining the voluminous discovery tendered to the defense. (WRR: 83). Because Jenkins was younger than Sigel, he had better success in communicating with applicant and often spoke with applicant about the case. (WRR: 84).

Approximately six weeks before trial, Sigel hired Karen Lambert to sit as co-counsel and assist him in applicant's trial. (WRR: 93, 109; AWE 3). Lambert has been licensed to practice law in the State of Texas since 1983. (AWE 3). Lambert worked as an assistant district attorney for ten years and then went into private practice as a criminal defense attorney. (WRR: 102; AWE 3). She has handled thousands of criminal cases and has tried over 300 criminal cases. (AWE 3).

### DEFICIENCY PRONG

### (1) Advice Regarding Plea

In ground 1 of his writ application, applicant contends that counsel was ineffective for failing to investigate and explain to applicant the option and advantages of pleading guilty to the jury. *See Writ Application at 6*.

11

Sigel's testimony at the writ hearing reflects that, after he was retained by applicant's family, he met with applicant and advised him of his rights, including his rights to remain silent, to plead guilty or not guilty, and to have a jury trial. (WRR: 77-78, 81-82). The pretrial discovery turned over to the defense demonstrated that the State had overwhelming evidence linking applicant to the string of burglaries. Applicant refused the State's plea bargain offer of forty years. Applicant told the defense team that he did not believe that the State could prove that he was guilty of engaging in organized criminal activity ("EOCA") as charged. (WRR: 79-80, 142-43; AWE 3). In light of the State's evidence, Jenkins, who had developed a close relationship with applicant, strongly urged him to enter a "slow plea" of guilty before the jury. (WRR: 84-85). However, according to Sigel, applicant "didn't want to plead guilty to anything." (WRR: 81-82).

The decision of whether to plead guilty belongs solely to the defendant. *See Jackson v. State*, 766 S.W.2d 504, 508 (Tex. Crim. App. 1985); *Burnett v. State*, 642 S.W.2d 765, 768 (Tex. Crim. App. 1982) (stating the criminal defense lawyer controls the progress of a case while the client confronts only three personal decisions: his plea to the charge, whether to be tried by a jury and whether to testify in his own behalf). Here, the record reflects that counsel advised applicant

12

of his rights and the option of pleading guilty. The strategy pursued by the defense – to enter a plea of not guilty and make the State prove beyond a reasonable doubt that applicant was guilty of EOCA – was done at applicant's behest after being advised of his rights. As such, applicant has not shown counsel was deficient in this regard.

### (2) Trial performance

In grounds 2-5, applicant complains about counsel's strategy and trial performance. Specifically, he contends that counsel was ineffective for failing to object to certain portions of Detective Gilbert Travis' testimony, for eliciting harmful and aggravating testimony from witnesses that the State did not elicit, and for employing and advancing numerous unreasonable trial strategies in front of the jury. *See Writ Application at 6a-6c*.

Sigel testified at the writ hearing that, based on the state of the evidence against applicant, he believed the best strategy at trial was "the truth defense." Counsel pursued this strategy throughout the trial by being open and honest with the jury and not hiding from any evidence, good or bad. Counsel hoped that, by doing so, he could gain the jury's trust and that they would not be surprised by later hearing negative evidence at punishment. (WRR: 79-80, 85-86, 95).

13

Additionally, during the punishment phase, counsel's strategy was to inform the jury that applicant was a person from a good family, was a productive member of society when he was not under the influence of drugs, and could be rehabilitated. Consistent with this strategy, counsel advised applicant to take the stand, accept responsibility for his actions, and apologize for the harm he caused the numerous victims he burglarized. Counsel repeatedly explained to applicant that his testimony was necessary to give the jury knowledge of the true Damon West absent drugs. Sigel spoke with applicant's family about his strategy for punishment and advised them of his opinion that applicant needed to testify. The family was in agreement and urged applicant to follow Sigel's advice. The defense team crafted their mitigation defense with the understanding that applicant would testify. At some point, however, applicant decided not to testify. This was a surprise to counsel. Sigel believed that applicant's failure to testify was the primary reason their mitigation defense failed. (WRR: 80, 83-84, 86-89, 91-92, 149; AWE 1).

A plan to appear open and honest with the jury – such as the one counsel employed here – constitutes reasonable strategy. *See Turner v. State*, 932 S.W.2d 622, 626 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (noting that the desire to

14

cooperate and be honest may be legitimate basis motivating counsel's actions); *Thomas v. State*, 886 S.W.2d 388, 392 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (trial counsel's decision not to object to improper testimony can be a plausible trial strategy when counsel desires to create the appearance of being open and completely honest with regard to all questions); *see also, e.g., Huerta v. State*, 359 S.W.3d 887, 894 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Baber v. State*, 931 S.W.2d 359, 362 (Tex. App.—Amarillo 1996, pet. ref'd); *Varughese v. State*, 892 S.W.2d 186, 195-96 (Tex. App.—Fort Worth 1994, pet. ref'd). The fact that writ counsel would have pursued a different strategy is insufficient to prove that counsel was ineffective. *See Miller*, 330 S.W.3d at 616 (the mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel).

Furthermore, even if counsel did commit some errors during applicant's trial by failing to object to certain evidence or by eliciting some unfavorable information on cross-examination, those isolated errors do not render counsel's entire performance deficient. An accused is not entitled to representation that is wholly errorless, and a reviewing court must look to the totality of the representation in gauging the adequacy of counsel's performance. *Frangias,* 392

15

S.W.3d at 653. Trials are human events and, as such, they undeniably contain human error. Applicant has failed to demonstrate that the totality of counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 689.

### *(3) Failure to Call Certain Witnesses*

Last, in ground 6 of his writ application, applicant contends that counsel was ineffective for failing to call Grayson West, Brandon West, and Danielle Delgadillo as defense witnesses during applicant's trial. *See Writ Application at 6d*.

In order to sustain a claim of ineffective assistance of counsel in failing to call witnesses, applicant must prove at a minimum that such witnesses were available and that defendant would have benefited from their testimony. *Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986); *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). Danielle Delgadillo was one of the punishment witnesses that was recommended by applicant's family and was scheduled to testify on applicant's behalf. However, due to trial scheduling delays and work commitments, she was unavailable to travel to Dallas at the time her testimony was needed. (AWE 22). Thus, the failure of counsel to present her as a witness was not due to his deficiency, but rather to her unavailability.

16

With regard to applicant's brothers Grayson and Brandon West, in addition to the bias they undoubtedly had and that would have been highlighted by the State on cross-examination, there were other problems with presenting them as witnesses. Grayson previously suffered from a severe drug addiction like applicant and lived with applicant at various times in Dallas. (AWE20). Applicant used Grayson's vehicle during his crime spree and, while in jail, solicited Grayson's help in moving stolen property from one of his storage units. This evidence raised credibility issues with Grayson's testimony, regardless of what he actually knew about applicant's illegal activities. In addition, his regular contact and close proximity to applicant during this time did not further counsel's strategy at punishment of trying to distance applicant from his life of topless dancers, drug use, and crime in Dallas. Likewise, his knowledge and contact with applicant during this time would have subjected him to cross-examination on a variety of topics that would have been detrimental to the defense.

Brandon West had not lived near or had frequent close contact with applicant in the five years preceding the charged offense. (AWE 21). That put him in the same position as the many other punishment witnesses called by the defense who cared about the applicant and were able to offer positive testimony

17

about the applicant prior to his drug addiction. However, unlike the other punishment witnesses, the State had recordings of jail calls between applicant and Brandon which did not portray Brandon in a positive light. For example, during one call applicant is explaining to Brandon how he cut off his ankle monitor[4] and spliced it back together and everyone thought he was at his apartment when he was actually at Quizno's getting a sandwich. (RR13: 153-54). Applicant said, "Yeah, when the cops busted in my front door, my ankle monitor was sitting on the couch next to me," and he and Brandon started laughing. (RR13: 153-54). Brandon replied, "Oops," and they laughed from there. (RR13: 153-54). In another call, applicant tells Brandon, "Check my email and check Pam's that I hacked into." (RR14: 86). Applicant stated, "I sent a nice letter to everyone about her being a whore," to which Brandon responded, "Nice." (RR14: 86).[5] Brandon's apparent lack of concern for the law and encouragement of applicant's behavior, as evidenced in the jail calls, diminished his credibility to the point that his testimony would have been more detrimental than beneficial.

---

[4] Prior to his arrest in this case, applicant was arrested and charged with assaulting his ex-girlfriend, Pam Evans, and was wearing an ankle monitor as a condition of his release on bond. (RR13: 152-53, 202-03).

[5] Evans previously testified that, following their breakup and applicant being charged with assaulting her, applicant threatened her and hacked into her email account and sent a vulgar email about her to all of her contacts.

Courts generally recognize that it is trial counsel's prerogative, as a matter of trial strategy, to decide which witnesses to call. *Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987), *cert. denied*, 484 U.S. 838 (1987); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). Counsel had a clear strategy in his presentation of witnesses during the punishment phase. The fact that writ counsel would have called additional or different witnesses is insufficient to show that counsel was deficient. *See Miller*, 330 S.W.3d at 616. Applicant has failed to prove that counsel was deficient for not calling these particular witnesses.

## PREJUDICE PRONG

Even if this Court were to find counsel's performance was deficient, applicant cannot show prejudice. This case was not about what evidence counsel elicited or failed to object to during the trial, what his advice was regarding pleading guilty or not guilty, or what additional character witnesses could have testified. This case was entirely about what sentence the applicant was going to receive in light of the sheer volume and appalling nature of his crimes. The only way the jury would have reached a more favorable verdict was if applicant had listened to the advice of his counsel and taken the stand during punishment.

19

*Strickland* requires the applicant to establish, by a preponderance of the evidence, that the harm resulting from trial counsel's deficiency undermines the confidence in the trial's outcome. *See Strickland*, 466 U.S. at 689. Applicant has not made this showing. In presenting his claims in the writ application and at the writ hearing, applicant has focused entirely on trial counsel's deficiencies. He has failed, however, to demonstrate that representation by a more competent trial counsel would have led to a different result. Even if applicant had entered a "slow plea" of guilty before the jury, the State would have still had to prove its case and would have still put on the same amount of evidence. The benefit of admitting guilt up front, as opposed to making the State prove its case and acknowledging guilt during the punishment phase, would have been negligible in a case of this magnitude. And while some of the evidence counsel elicited or failed to object to may have been unfavorable, applicant fails to prove that, if all of the complained-of evidence had not been before the jury, the outcome at trial would have been different. Likewise, he fails to prove by a preponderance of the evidence that the presentation of three additional witnesses at punishment would have changed the outcome of the proceeding.

20

It is not surprising that applicant makes no mention of the incredible facts of this case. Applicant was not your average burglar. The State's evidence showed that applicant was the ring leader of a group that committed a shocking number of home burglaries in the Uptown area of Dallas and other surrounding areas. There were fifty-one confirmed victims of burglaries with similar characteristics. The group used a unique method of entry, namely a small hole drilled above the deadbolt lock. Applicant and his cohorts committed the burglaries when the victims were out of town for several days, allowing them ample time to go through every inch of the home and clear out the property. In some cases, they even squatted in the homes, leaving behind disheveled beds, empty pantries and fridges, beer cans, and cigarette butts. The type and amount of property taken from the homes was generally the same and included disturbingly intimate items such as women's underwear, used makeup, and collectibles of no value except to the owner who had collected them. Much of the stolen property was recovered in apartments and storage units rented by applicant or his cohorts. After hearing the State's evidence, the jury returned a guilty verdict in just twelve minutes.

Defense counsel presented a thorough punishment case and argued that applicant deserved leniency because he was a law-abiding citizen from a loving

and supportive family until he made the mistake of becoming addicted to illegal drugs. With the assistance of applicant's family, defense counsel organized an extensive lineup of character witnesses to testify on applicant's behalf, including: applicant's mother and father; former Texas Land Commissioner and gubernatorial candidate Garry Mauro, who had worked closely with applicant during the 2004 campaign; Arthur Schecter, a Houston attorney and a former ambassador to Bermuda under Bill Clinton, who also worked closely with applicant during the 2004 campaign and had given applicant the keys to his River Oaks mansion to come and go as he pleased when in Houston; Father Don Donahugh, applicant's priest where he attended church in Port Arthur; Mike Owens, applicant's high school football coach; and Bill Maddox, applicant's godfather and former editor of the Port Arthur News. Defense counsel also presented expert testimony from doctors who had done extensive testing on applicant and determined that he was sexually molested by a babysitter at age nine, that he suffers from attention deficit disorder, that he was not a sociopath or psychopath, and that what he needed most was intensive drug treatment.

In light of all the evidence at trial, the record does not support a finding that the jury would have reached a more favorable verdict if a few pieces of

negative evidence had been omitted or a few additional character witnesses had been added to the defense's punishment case. The disturbing nature and number of burglaries committed most certainly supported the jury's sentence of sixty-five years' imprisonment. In reality, the only thing that would have changed the outcome of applicant's sentence in this case would have been for him to take the stand, accept responsibility for his actions, and throw himself on the mercy of the jury. Indeed, this is exactly what counsel had envisioned and built the mitigation case around. While the character witnesses played an important role, applicant's own testimony was vital to tie it all together and allow the jury to see the true Damon West absent drugs. Applicant listening and following the advice of his defense team and his family was the only thing that would have changed the outcome in his case.

## PRAYER

The State respectfully requests that this Court deny the relief requested by applicant in his application for writ of habeas corpus.

Respectfully submitted,

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625 *phone*
(214) 653-3643 *fax*
joconnor@dallascounty.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief, inclusive of all contents, is 4,502 words in length according to Microsoft Word and complies with the word-count limit provided for in the Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 9(i)(2)(B).

Jaclyn O'Connor Lambert

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing brief was served on applicant's counsel, Chip Lewis, chipblewis@aol.com, via e-service on May 15, 2015.

Jaclyn O'Connor Lambert